664 F.3d 332 (2011)
In re Complaint of JUDICIAL MISCONDUCT.
No. C.C.D. 11-01.
U.S. Judicial Conference Committee on Judicial Conduct and Disability.
December 1, 2011.
Present: Judges JOHN M. WALKER, JR., Chair, EDITH BROWN CLEMENT, DAVID M. EBEL, JAMES E. GRITZNER, THOMAS F. HOGAN.[1]

AMENDED MEMORANDUM OF DECISION
This matter is before the Judicial Conduct and Disability Committee on the complainant's petition for review of an April 8, 2011 order of the Sixth Circuit Judicial *333 Council dismissing a complaint that she filed under the Judicial Conduct and Disability Act, 28 U.S.C. §§ 351-64 (the "Act"). The complaint alleges that Judge George C. Paine, II,[2] Chief Judge of the United States Bankruptcy Court for the Middle District of Tennessee, has committed misconduct by holding membership in an organization that practices invidious discrimination on the bases of race and sex. The Sixth Circuit Judicial Council, citing Judge Paine's efforts to change the practices of the organization, found no misconduct. We disagree and conclude that Judge Paine's club membership violates Canons 2A and 2C of the Code of Conduct for United States Judges and constitutes misconduct under the Act.

BACKGROUND

A. Facts
Belle Meade Country Club ("Belle Meade" or the "Club") is a 110 year-old private social club located in Nashville, Tennessee. The Club's Constitution sets forth six membership categories: Resident, Non-resident, Lady, Associate Resident, Ministers of Gospel, and Honorary Resident. Management of the Club is vested exclusively in Resident Members, who alone have the right to vote, hold office, and propose new members.[3] To become a member, a candidate must be proposed by two Resident Members and unanimously approved by the Club's Board of Directors and Membership Committee. Judge Paine has been a Resident Member of Belle Meade since 1978.
Belle Meade has never had and presently has no female Resident Membersall female members are Lady Members. Lady Members, who pay lower fees than Resident Members, are defined as "unmarried females" who "have attained 18 years of age," and historically have been widows of Resident, Honorary, Associate, and Non-resident Members. At any time there can be no more than 175 Lady Members.[4] Although the Constitution and Bylaws do not prohibit women from becoming Resident Members, there is conflicting evidence as to whether women unofficially are barred from such membership. Two members have stated (one under oath) that women are so barred. Others have testified that there is no such prohibition. Additionally, there is evidence that at least two women have been approached about seeking Resident Membership but have declined.
Nor does Belle Meade have any African American Resident Members but, as with women, there is no express prohibition. The Club has one African American Nonresident Member who lives and works in Atlanta, Georgia, more than two hundred miles outside of Nashville. Membership proposals for two African American Resident Member candidates, one of whom Judge Paine sponsored, have been pending for at least four years.[5] Several African Americans have declined requests to seek Resident Member status.
To his considerable credit, Judge Paine wrote a strong letter in August 1990 to the *334 Club's Board of Directors in response to other letters "received [by the Board] in regards to the perceived exclusionary policies of Belle Meade." Judge Paine considered it "long overdue that the Club have Jewish and black associate and resident members" and thought it "patently preposterous that there are not persons in these racial and religious groups who would not be excellent participating members of the Club." Given his impression that adverse publicity could diminish the value of Club membership, Judge Paine suggested that the Board members' fiduciary duty required that they "protect[ ] [the Club's] interests on this issue."

B. Procedural History
This complaint, filed in May 2008, alleges that Judge Paine's membership in Belle Meade constitutes judicial misconduct. In particular, it alleges violations of Canons 2A and 2C of the Code of Conduct for United States Judges. Canon 2A states that "[a] judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Under Canon 2C, "[a] judge should not hold membership in any organization that practices invidious discrimination on the basis of race, sex, religion, or national origin."
The complaint initially was reviewed by then-Chief Judge Boggs of the Sixth Circuit Court of Appeals, as required by 28 U.S.C. § 352. After conducting a limited investigation, Judge Boggs dismissed the complaint for failure to make an adequate showing of misconduct.
The complainant petitioned the Sixth Circuit Judicial Council for review of Judge Boggs's dismissal. The Council, under Chief Judge Batchelder, tasked its Standing Special Committee with investigating the complaint. With the help of outside counsel, the Special Committee interviewed the complainant, as well as a Mr. Alex Friedmann, who apparently has assisted the complainant in the pursuit of these charges, and several members of Belle Meade including Judge Paine. Based on its investigation, the Special Committee made findings of fact (most of which are summarized above) and concluded that Judge Paine's membership at Belle Meade does not violate the Code of Conduct.[6]
The Sixth Circuit Judicial Council, by a vote of 10-8, adopted the Special Committee's report and agreed with its ultimate conclusion. The majority determined, among other things, that Judge Paine's "long and sincere efforts to integrate the club in question . . . preclude a finding that he has engaged in misconduct."
The complainant appealed.

DISCUSSION
We defer to the findings of the Sixth Circuit Judicial Council and overturn *335 them only if clearly erroneous. See In re Complaint of Judicial Misconduct, 640 F.3d 354, 356 (U.S.Jud.Conf. Apr. 12, 2010) (citing In re Memorandum of Decision, 517 F.3d 563, 569 (U.S.Jud.Conf. Jan. 14, 2008)).
On appeal, the complainant argues that (1) the decision of the Sixth Circuit Judicial Council was against the weight of the evidence, (2) the decision inappropriately relied on factors other than the Club's membership practices with respect to race and sex, and (3) the Special Committee's investigation was insufficient. We agree with the complainant's first two arguments and, as to the third, we conclude that, although the Special Committee might have engaged in a more thorough investigation,[7] the evidence in the record is sufficient to resolve this matter.

A. Canons 2A and 2C
Congress created the Judicial Conference as "the principal policy making body concerned with the administration of the U.S. Courts."[8] The Judicial Conference, in turn, adopted the Code of Conduct to aid judges and judicial nominees and to "provide standards of conduct for application in" judicial-conduct and judicial-disciplinary proceedings brought pursuant to the Act. Commentary to Canon 1. The Canons of the Code of Conduct offer general guidance. "[I]t is not intended that disciplinary action would be appropriate for every violation of its provisions," especially "where reasonable judges might be uncertain as to whether or not the conduct is proscribed." Id. "Whether disciplinary action is appropriate, and the degree of discipline to be imposed, should be determined through a reasonable application of the text and should depend on" the particular circumstances of the infraction. Id.
As noted above, the complaint asserts that Judge Paine's membership in Belle Meade runs afoul of Canons 2A and 2C. Canon 2A sets forth the broad command of which Canon 2C is one instance: "A judge. . . should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Judges must avoid not only actual impropriety but the "appearance of impropriety." Commentary to Canon 2A; see also 28 U.S.C. § 455(a) (a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned"). This rule is criticalthe judiciary's ability to decide cases efficiently and effectively would be severely impaired, and public confidence in the courts would be undermined, if litigants had reason to suspect judicial bias. In other words, "to perform its high function in the best way `justice must satisfy the appearance of justice.'" In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (quoting Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)); see also Mayberry v. Pennsylvania, 400 U.S. 455, 469, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (Harlan, J., concurring) ("[T]he appearance of evenhanded justice . . . is at the core of due process").
The judiciary therefore must take every appropriate measure to instill public confidence in the impartial administration of justice. For this reason, and especially in view of the "constant public scrutiny" *336 that "judge[s] must expect," Commentary to Canon 2A, members of the judiciary are required to accept unique and heightened restrictions on their personal lives that would not pertain to ordinary citizens. Id.[9] Although the Code of Conduct does not purport to enumerate every such restriction, Canon 2C does set forth a mandatory prohibition.
"Membership of a judge in an organization that practices invidious discrimination gives rise to perceptions that the judge's impartiality is impaired." Commentary to Canon 2C. For that, reason, Canon 2C forbids judges from "hold[ing] membership in any organization that practices invidious discrimination on the basis of race, sex, religion, or national origin."[10] Considered in the context of Canon 2A, the invidious discrimination contemplated by Canon 2C has a specific meaning. We are not concerned here only with the sort of discrimination prohibited by the Civil Rights Act, Title VII, or the Constitution. Instead, like Canon 2A, Canon 2C also addresses appearances. Quite simply, judges may not be members of organizations that would reasonably appear to the public to discriminate in their membership practices on any of the grounds listed in Canon 2C.
"[A]n organization is generally said to discriminate invidiously if it arbitrarily excludes from membership on the basis of race, religion, sex, or national origin persons who would otherwise be admitted to membership." Commentary to Canon 2C. Because organizations rarely advertise discriminatory practices, though, "[w]hether an organization practices invidious discrimination" for purposes of Canon 2C "is often a complex question." Id. Typically, the inquiry is fact-specific and the answer depends on such factors as the organization's selection criteria, goals, size, and geographic location. A strong presumption of invidious discrimination arises where "reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of such discrimination, id., but the membership is not diverse.

B. The Weight of the Evidence
Applying the standards discussed above, we easily conclude that Belle Meade invidiously discriminates against women and African Americans for purposes of Canon 2C and, consequently, that Judge Paine's membership in the organization runs afoul of that Canon. Nashville, Tennessee, is one of the major cosmopolitan cities of the Southern United States. In particular, according to 2010 Census data, it boasts a 28% African American population and its female population is over 50%. Although few organizations perfectly mirror the population trends of their surrounding locales, a member of the public would reasonably expect to see at least some women and African Americans among Belle Meade's Resident Membership *337 barring (1) invidious discrimination or (2) something unique about the Club "such as that the organization is dedicated to the preservation of religious, ethnic or cultural values of legitimate common interest to its members," id.that would suggest otherwise. There is, however, nothing about Belle Meade's stated aims or activities that provides any such justification for the total absence of any female or African American Resident Members. The organization is a social club for prominent persons living in and around the Nashville area. Naturally, there is no shortage of women oras Judge Paine proclaimed in his 1990 letter to the Club's BoardAfrican Americans fitting that description.[11]
Moreover, although evidence of purposeful discrimination is not a requirement of Canon 2C (and, indeed, is expected to be rare), there is some such evidence in this case. Lady Members have no power to control, manage, vote, or hold office in the Club, and are limited in number to fewer than one sixth of the Club's total approximate membership.[12] Although there appears to be no explicit prohibition on women becoming Resident Membersand there is some evidence that women are eligible (and have been sought out) for such membershipthe remaining evidence concerning Lady Membership bolsters the already justifiable public perception of invidious gender discrimination. Indeed, Belle Meade's Bylaws give the distinct impression that the Club is structured for "members" who are male, predominantly if not exclusively:
Privileges of the Club and its facilities are extended to wives of members and unmarried children of members who are 25 years of age and under. In addition, the following, provided each resides in the household of a member, shall also be entitled to the privileges of the Club and its facilities: fathers and fathers-in-law who are over 70 years of age, widowed mothers and widowed mothers-in-law, and unmarried daughters who are over 25 years of age. (emphasis added).
There is also considerable evidence of intentional discrimination with respect to African Americans. Judge Paine has tried for more than two decades to persuade the Club to open its membership to African Americans, even going so far as to put forward his own candidate, without result. It is difficult for usand, we expect, the publicto conjure a benign explanation for the Club's failure to integrate its Resident Membership in the face of Judge Paine's endeavors and the sentiment expressed in his 1990 letter.
Our impression that the public justifiably perceives that Belle Meade invidiously discriminates is not based solely on speculation or surmise. Rather, there is tangible support for this conclusion in the public arena. Judge Paine's membership in Belle Meade and the Sixth Circuit Judicial Council's decision have been a source of much public interest and controversy.[13] *338 Moreover, another Club member who was nominated to the federal bench in 2008 was publicly chastised on the basis of that membership and ultimately failed to receive confirmation. Our analysis does not depend upon this publicity and in no sense is our conclusion in this matter a response to perceived public pressure. But the publicity over judges' membership in Belle Meade corroborates our independent conclusion that Judge Paine's membership in the Club creates an appearance of impropriety that we cannot condone.[14]

C. Extraneous Factors Relied upon by the Special Committee and Sixth Circuit Judicial Council
In reaching a contrary conclusion, the Special Committee and Sixth Circuit Judicial Council relied upon two factors that, in our view, are not relevant to consideration of this complaint.
First, the Special Committee emphasized that "[t]here are gay, Jewish, and other non-African American persons of color who are Resident members of" Belle Meade. It reasoned that these members' "presence on the membership rolls contradicts a belief that the Country Club is arbitrarily excluding members on the basis of race, religion, or national origin."[15] The question for purposes of Canon 2C, though, is whether an organization invidiously discriminates on onenot allof the listed bases. That Belle Meade does not discriminate against members of certain sexual-orientation, religious, or ethnic groups therefore says nothing about whether the Club discriminates specifically against women or African Americans.
Second, both the Special Committee and the Sixth Circuit Judicial Council relied on Judge Paine's "long and sincere efforts to integrate" Belle Meade in concluding that he has not committed judicial misconduct. Admirable though we find Judge Paine's efforts have been, however, they do not change the analysis under Canon 2C. The ultimate question we face is not whether Judge Paine personally practices or participates in invidious discrimination or whether he tried to change those practices at Belle Meade. Under the Code of Conduct, a judge gives the appearance of impropriety and therefore violates Canons 2A and 2C simply by being a member of an organization that invidiously discriminates. This is a bright-line rule without a subjective component.

D. Guidance on Complying with Canon 2C
Thus, judges must exercise vigilance in complying with Canon 2C. Any judge considering membership in an organization should take steps to ensure that such membership would not appear improper. Naturally, those steps will differ to some degree depending on the particular circumstances. But we expect them to include, in all cases, a survey of the group's membership, constitution, and bylaws. If "reasonable persons with knowledge of all the relevant circumstances would expect that the membership would be diverse in the absence of invidious discrimination," *339 Commentary to Canon 2A, but the membership nevertheless is not diverse, the judge should err on the side of caution and decline membership. Although such a restriction "might be viewed as burdensome by the ordinary citizen," it is one that judges should accept "freely and willingly." Id.
The two-year remediation provision set forth in the Commentary to Canon 2C qualifies the above admonition to a limited extent:
When a judge determines that an organization to which the judge belongs engages in invidious discrimination that would preclude membership under Canon 2C or under Canons 2 and 2A, the judge is permitted, in lieu of resigning, to make immediate and continuous efforts to have the organization discontinue its invidiously discriminatory practices. If the organization fails to discontinue its invidiously discriminatory practices as promptly as possible (and in all events within two years of the judge's first learning of the practices), the judge should resign immediately from the organization.
This does not mean, of course, that a judge may join any discriminatory group whatsoever as long as he or she resigns within two years. Instead, the two-year qualification must be read in light of Canon 2C's safeguarding of the appearance of propriety. Thus, we believe that this provision is available only if a judge determines that diversification efforts by the judge could reasonably succeed. In those circumstances, he or she may continue to hold membership in diligent pursuit of those efforts for a reasonable period of time not to exceed two years.
In any event, this remediation provision does not apply here. The Commentary's two-year parameter is clear. Judge Paine, however, was aware of the Club's "perceived exclusionary policies" at least 21 years ago, when he urged the Club to diversify. Any two-year remediation period came and went long ago. Canon 2C plainly does not permit a judge to belong to an organization that invidiously discriminates for as long as he or she keeps trying to change its practices, however long that may be.

* * *
The Sixth Circuit Judicial Council opined that, "although reasonable minds couldand indeed dodiffer on the question of whether th[e] Club engages in invidious discrimination, the specific issue [here] is whether [Judge Paine] has committed judicial misconduct." We disagree. Whether an organization to which a judge belongs practices invidious discrimination and whether that judge has committed judicial misconduct by being a member of the organization are the same question. Such membership by a sitting judge necessarily has "a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 3(h)(2).

CONCLUSION
For the reasons discussed above, we conclude that, on the present record, the conclusion that Belle Meade engages in invidious discrimination against women and African Americans is inescapable and, to the extent the Sixth Circuit Judicial Council reached a different conclusion, that conclusion is clearly erroneous. Therefore, Judge Paine's membership in Belle Meade while sitting as a judge violates Canons 2A and 2C and thus constitutes misconduct under the Act.
*340 Judge Paine has announced his forthcoming retirement at the end of 2011. For that reason, and because this decision represents the first enforcement of Canon 2C, there is no cause for us at this point to order Judge Paine's removal from office or to take disciplinary action beyond the public reprimand that this opinion represents. Should Judge Paine change his retirement plans, however, we would be required to revisit this conclusion.
Finally, we note with unreserved sincerity that our decision is not intended to impugn Judge Paine's good faith, of which there is much evidence. He tried to change the Club's discriminatory practices by writing a letter challenging those practices and by promoting the cause of at least one African American applicant for Resident Membership. Moreover, the bright-line rule that we have announced today that pertains to Canon 2C is the first such pronouncement on the Canon by this Committee or any Judicial Council.
More generally, Judge Paine has dedicated much of his life to public service: first in the military, where he served as an officer in the Army and was awarded the Purple Heart and, since 1981, as an able bankruptcy judge for the Middle District of Tennessee. He has also made a significant contribution as a volunteer judge in promoting the Rule of Law in newly democratic countries. Thus, in our view, Judge Paine is retiring from the judiciary with his reputation for devoted service to his country intact.
NOTES
[1] This panel comprised live members of the seven-member Committee as required by RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 21(c). One member was disqualified because he was a judge within the Sixth Circuit. Id. Another judge was recused.
[2] The Committee has determined that Judge Paine's name will be disclosed in this Opinion.
[3] There is one exception to this rule (not relevant here) for Board members who transition from Resident to Honorary Resident status.
[4] As of 2007, the Club had more than 1,100 total members of all categories.
[5] The pendency period for accepted applications appears to have varied historically. There is evidence that some applications were approved after eighteen months, whereas another had been pending for eleven years before acceptance.
[6] At the end of its report, the Special Committee noted potentially relevant evidence that it had not obtained in its investigation. This evidence included Belle Meade's membership records and testimony from a Resident Member and former President of the Club's Board who had been quoted in the Nashville press as stating that women cannot become Resident Members. The Special Committee justified its failure to subpoena this testimony on the basis that, even if this member testified that women could not become Resident Members, there was credible testimony to the contrary from a current member of Belle Meade's Membership Committee. With respect to the Club's membership records, the Special Committee explained that they "would likely have limited utility." The Special Committee also did not obtain Judge Paine's August 1990 letter to the Board and chose, instead, to rely on the judge's recollection of that letter. It concluded that "there is likely little to be gained by additional investigation and a final decision can be reached that is rational[ ] and well founded on the evidence" already obtained.
[7] That the Special Committee declined to seek all material evidence and appeared to resolve ambiguities in the record against the complainant suggests that it did not conduct the sort of searching investigation appropriate in all the circumstances.
[8] Judicial Conference of the United States, http://www.uscourts.gov/FederalCourts/ JudicialConference.aspx (last visited Nov. 30, 2011).
[9] See also THE JUDICIAL CONDUCT AND DISABILITY ACT STUDY COMMITTEE, IMPLEMENTATION OF THE JUDICIAL CONDUCT AND DISABILITY ACT OF 1980: A RETORT TO THE CHIEF JUSTICE 147 (2006) ("[T]he fact that a judge's alleged conduct occurred off the bench and had nothing to do with the performance of official duties, absolutely does not mean that the allegation cannot meet the statutory standard" for cognizable judicial misconduct).
[10] To our knowledge, Canon 2C has never before been enforced. The initial Code of Conduct, which the Judicial Conference adopted in 1973, contained no provision or commentary regarding membership in discriminatory organizations. In 1981, the Judicial Conference adopted language in Canon 2's commentary indicating that membership in discriminatory organizations is improper, but left the ultimate determination of propriety to the particular judge. Canon 2C and its commentary were adopted in 1992.
[11] See, e.g., Noelle Mashburn, Middle Tennessee's Most Prominent Women `Go Red' For Children's Health, EXAMINER.COM, Nov. 10, 2010, http://www.examiner.com/fitness-trends-in-nashville/ middle-tennesse-s-most-prominent-women-go-red-for-children-s- health (last visited Nov. 30, 2011); Drew Ruble, 50 Most Powerful, BUSINESS TENNESSEE, Oct. 2004, http://businesstn.com/content/50- most-powerful (last visited Nov. 30, 2011).
[12] For purposes of Canon 2C, it is irrelevant that Lady Members pay lower fees than Resident Members. Indeed, insofar as Lady Membership is preferable to other forms of membership, the exclusion of men from that category arguably constitutes another form of gender discrimination under the Code.
[13] See, e.g., Adam Liptak, Weighing the Place of a Judge in a Club of 600 White Men, N.Y. TIMES, May 17, 2011, at A16.
[14] See, e.g., Letter from Susan Scanlan, Chair of National Council of Women's Organizations, to Senator Patrick Leahy, Chairman of Senate Committee on the Judiciary (Mar. 18, 2008) ("If [former judicial nominee] Mr. Puryear is appointed to the federal bench, it is difficult for us to conceive how women defendants and plaintiffs, or indeed women attorneys, could appear before him and expect to receive impartial and equal consideration given Mr. Puryear's past membership in the Belle Meade country club.").
[15] Although the Sixth Circuit Judicial Council did not duplicate this reasoning in its majority opinion, it "adopted the Committee's Findings, Analysis and Recommendation."